A07A0906. IN THE INTEREST OF E. D. et al., children.
(650 SE2d 800)

MIKELL, Judge.

On November 13, 2006, the juvenile court entered an order finding E. D., K. D., K. W., and J W.,[1] deprived and continuing temporary custody in the Telfair County Department of Family and Children Services (the "Department"). M. G., the mother of all four children, and B. W., the father of K. W. and J. W., appeal, challenging the sufficiency of the evidence. We affirm.

---

[1] E. D., K. D., and J. W. are boys aged sixteen, fifteen, and seven; K. W. is an eight-year-old girl.

On appeal from a juvenile court's order finding deprivation, we review the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the children were deprived. We neither weigh evidence nor determine the credibility of witnesses.[2]

So viewed, the evidence adduced at the hearing held on October 4, 2006, shows that the Department became involved with the family on February 1, 2006, upon receiving a report from the Tennessee Department of Children Services concerning violence and alcohol abuse in the home. E. D., the eldest minor child, testified that in January 2006, when the family was living in Tennessee, he witnessed a serious physical altercation between his mother and B. W. They were fistfighting, then B. W. "was stomping on her chest with his boots." All the children tried to get B. W. away from their mother, and E. D. called 911. B. W. took J. W. and hid in the woods from the police. E. D. testified that his mother suffered a broken nose, bruises on her chest, and a cut requiring stitches in her eyebrow. According to E. D., his mother and B. W. had been drinking beer all day.

Michelle Christian Norris, a social services case manager employed by the Department, testified that the mother confirmed the domestic violence and stated that she had moved with the children to Georgia to get away from B. W. Margaret Dover, the mother's aunt, testified that the mother and children moved into Dover's home in Telfair County for a few weeks in February until they found another place to live. The mother signed a safety plan on February 1, which required her to ensure that B. W. had no physical contact with the children and to call the police if he came to the home.

Norris testified that caseworkers visited with the mother and children through April, urging the mother to undergo drug and alcohol and mental health assessments. Another caseworker, Bennie Watson, testified that the Department formulated a case plan, but the mother refused to sign it because it required her to undergo a mental health assessment. Norris first met with the mother on May 17; the mother was uncooperative, stating that the Department had no right to intervene in her life and that nothing had happened in her home. The father moved back into the home. According to E. D., B. W. had never really left, but sometimes stayed in a nearby motel. E. D.

---

[2] (Punctuation and footnotes omitted.) *In the Interest of G. G.*, 253 Ga. App. 565 (560 SE2d 69) (2002).

testified that he had witnessed three or four instances of drunken fighting between his mother and B. W. since the family moved to Georgia.

Tmetria Montgomery, who is employed as a client advocate for a social services agency, testified that she assessed the mother at the Department's office on February 6. According to Montgomery, the mother told her "that there were numerous police reports and that she usually was the primary aggressor." The mother was referred for mental health evaluation to help her with anger management, but Montgomery did not know if the mother followed through with the referral. Montgomery tried to meet with the mother in April in order to assist her with furnishing her home, but the mother informed Montgomery that her services were not required because B. W. "had come down and helped her get what she needed for the house."

Based on the domestic violence and the mother's refusal to sign the case plan, the Department filed a complaint on behalf of each child on June 23, 2006. Another serious incident occurred on July 30, when B. W. called 911 and accused E. D. of molesting J. W. Officer Jimmy Adams of the Telfair County Sheriff's Department testified that he picked up B. W. and a "small boy" from the Wheeler County sheriff and brought them to the Telfair County jail. The mother arrived and "went to cussing." Adams put her inside the jail until she calmed down. Deputy John Merritt, Jr., testified that B. W. smelled of alcohol. He performed an alcohol test on B. W., which registered 0.18. Merritt permitted B. W. to leave in exchange for his promise to rent a motel room and not return home or contact the mother. B. W. did not comply, as the mother later called 911 to report that B. W. was making harassing telephone calls to her. Merritt was dispatched to the motel, and B. W. was escorted home.

Adams called the Department, and Norris, Watson and an additional caseworker, Leslie Pope, responded to the home. According to Norris, the mother stated that B. W. was very drunk and that a physical altercation ensued when she tried to stop him from riding on a four-wheeler with J. W. The mother reported that B. W. hit her, grabbed her by the neck, and pushed her face in the dirt, and that K. D., who was then 14, hit B. W. with a stick to keep him from beating his mother. E. D. "left walking."

A few days later, Norris discussed the seriousness of the domestic violence with both parents. They admitted to her that they had a problem with "continuous" use of alcohol, and the mother stated that she would usually leave with the children until B. W. "passed out." B. W. admitted making a false allegation of child molestation against E. D., citing revenge as the reason. Norris explained the emotional impact of the false allegation upon E. D. and the traumatizing effect of the children witnessing and intervening in the parents' drunken

altercations. E. D. was struggling in school and told caseworkers "he just couldn't handle it anymore." Mental health assistance was obtained for him but not for the other children, because they did not seem to be having difficulties.

Watson and Pope testified that they completed a safety plan for the mother and children on that day. The plan stated that the mother agreed to place the children with Dover; that Dover agreed to call the police if either parent tried to take custody of the children; and that Departmental funds would be used as necessary to ensure the children's safety. Dover testified that the children stayed with her for three weeks. Then K. W. slapped Dover's granddaughter, pushed her down on the bed, and began hitting her with a pillow. Dover spanked K. W., but the mother misunderstood the reason and became upset. Dover decided it would be best not to keep the children any longer, and she asked the mother to place them elsewhere.

The Department contacted the mother and developed another safety plan on August 17. The plan specified that the mother and the children would reside in the home, while B. W. would reside elsewhere. Both parents signed the case plan, but E. D. refused to go home. The mother agreed to permit the Department to place E. D. in foster care. However, the parents called Norris on the following day to express their dissatisfaction with the plan. B. W. wanted to return to the home, and he accused Norris of falsifying the case plan. Ultimately, the parents agreed to abide by the case plan. Later, however, the Department received a report that B. W. was living in the home. B. W. stated that he was living in the shed. The mother, however, refused to allow the caseworkers inside the shed to determine whether B. W.'s claim was truthful.

Yet another incident occurred on August 31, when the parents were summoned to E. D.'s school for a meeting. Sheriff's Deputy Sandra Rivers testified that she happened to be meeting with the principal that day for an unrelated reason, that she passed the parents in the hall, and that she smelled alcohol on B. W. Because the school has a policy of zero tolerance for alcohol, Rivers asked B. W. to step outside to her car. The mother took B. W. by the hand, pulled him away from Rivers, and stated that he did not have to go "anywhere" with her. Wanting to avoid a scene at school, Rivers transported B. W. to jail in her patrol car and administered a test on a portable intoximeter. The result was very low for the consumption of alcohol, and B. W. attributed it to Nyquil.

On September 6, the mother appeared at the Department's office and requested E. D.'s release from foster care. The parents came in for a meeting, and they denied that the three younger children had any problems. B. W. also stated that he was living in the home and would not move out. On September 12, the Department obtained an order

for shelter care for all four children, and they remain in foster care to this date. The deprivation petition was filed on September 18.

The Department referred the mother to Juianis L. Woodford, a registered occupational therapist and licensed clinical counselor. Woodford testified that she met with the parents and the three younger children to address the trauma the children had experienced and to see what the parents were willing to do to bring E. D. back into the home. B. W. declined services. Woodford had a second meeting with the mother at the Department's office where Woodford offered reunification services and explained the need for counseling for the children to determine whether they were traumatized by the domestic violence and substance abuse in the home. Again, the mother declined assistance. Norris testified that E. D. began treatment with a psychiatrist and that all the children are in counseling. A second counselor who works under Woodford, Deidre Conaway, testified that E. D. is depressed and that she and Woodford are working with all the children to try to help them feel safe. Conaway testified she is unable to assist in reunifying the family because the parents refuse services.

The youth pastor from the First Baptist Church in McRae testified that the parents had been attending services for several months and had been bringing their children until several weeks prior to the hearing. The pastor testified that the children had been attending Sunday school and participating in children's programs at the church.

The mother admitted that she and the father abuse alcohol, and that the alcohol abuse led to the family violence. But the parents also testified that they had refrained from drinking for more than a month prior to the hearing and attended substance abuse classes. They tendered into evidence letters from a counselor at a community health center indicating that they had attended classes regularly and passed drug and alcohol screens. Nevertheless, when questioned as to whether she intended to comply with a case plan, the mother testified, "We'll do the alcohol, and basically that's all we need."

Based upon all of the foregoing evidence, the juvenile court found that B. W. falsely reported that E. D. molested a child; that the report was an indicator of B. W.'s need to control each family member regardless of the consequences; that B. W.'s negative relationship with the child, who intervened when his mother was attacked by B. W., harmed E. D.'s emotional well-being; that the mother continually sided with B. W.; and that all of these factors placed the children in a dangerous environment. The court further found that E. D. is suffering emotional problems due to domestic violence and alcohol abuse he has endured in the home of his mother and that none of the children are safe with B. W. in the home or while the parents are abusing alcohol. In addition, the court found that the parents have

not refrained from domestic violence or drinking alcohol as required by their case plans; and that their unrehabilitated abuse of alcohol and continued domestic violence in the presence of the children placed them in danger. The court determined that the Department made reasonable efforts to preserve and reunify the family prior to the placement of the children in foster care or to prevent or eliminate the need for removal of the children from the home; however, the parents refused to cooperate with the Department, refused necessary services offered for the children, and failed to protect the children. Accordingly, the court concluded that the children were deprived as defined in OCGA § 15-11-2 (8) (A). The court continued temporary custody of the children in the Department for a period not to exceed 12 months and directed the Department to prepare a case plan for reunification pursuant to OCGA § 15-11-58.

The parents' sole enumeration of error, that the evidence is insufficient to support the juvenile court's findings of fact by clear and convincing evidence, is without merit. A deprived child is a child who is "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals."[3] "The [deprivation] petition is brought on behalf of the child and it is the child's welfare and not who is responsible for the conditions which amount to deprivation that is the issue."[4]

In determining whether a child is without proper parental care or control, the juvenile court may consider "excessive use of or history of chronic unrehabilitated abuse of intoxicating liquors . . . with the effect of rendering the parent incapable of providing adequately for the physical, mental, emotional, or moral condition and needs of the child."[5] Here, the parents admitted chronically abusing alcohol and further admitted that such abuse led to domestic violence. B. W.'s false allegation of child molestation against E. D., admittedly motivated by a desire for revenge, affected E. D. so badly that he refused to live at home and required psychiatric treatment. The parents complain that the Department did not prove that any child other than E. D. was negatively affected by the alcohol abuse and domestic violence, but it is clear from the testimony of Woodford and Conaway that they could not properly assess the children before their removal from the home because the parents prevented an evaluation. Furthermore, these counselors also testified that they have been working

---

[3] OCGA § 15-11-2 (8) (A).

[4] (Punctuation and footnote omitted.) *In the Interest of J. L.*, 269 Ga. App. 226, 228 (1) (603 SE2d 742) (2004).

[5] (Footnote omitted.) *In the Interest of T. L.*, 279 Ga. App. 7, 12 (1) (630 SE2d 154) (2006). See also OCGA § 15-11-94 (b) (4) (B) (ii).

with the children since their placement in foster care to help them feel safe. Even without testimony as to the effect on the children, the trial court was authorized to infer from the evidence that the alcohol abuse and domestic violence in the home had an adverse effect on the minor children.[6] Moreover, the parents repeatedly refused counseling for the children, and the mother intimated at the hearing that she needed to address only her alcohol abuse problem, not her anger management problem, supporting the court's conclusion that the children were in need of protection.

The remainder of the parents' arguments address the weight to be given to certain evidence and testimony. For example, the parents complain that the juvenile court discounted their testimony that they had enrolled in an alcohol abuse program and evidence that they attended church regularly. However, "[i]t is the province of the juvenile court to weigh the evidence and determine its credibility. The . . . court exercises its discretion in issuing its ruling, and this Court defers to the factfinder unless the appellate standard has not been met."[7] In the case at bar, any rational trier of fact could have found by clear and convincing evidence that the children were deprived.

*Judgment affirmed. Johnson, P. J., and Phipps, J., concur.*

DECIDED AUGUST 9, 2007.

*Stephanie D. Burton, Steven M. Harrison*, for appellants.
*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charles M. Johnson*, for appellee.

---

[6] See *In the Interest of K. W.*, 279 Ga. App. 319, 321 (631 SE2d 110) (2006) (controlled substance abuse); *In the Interest of T. L.*, supra (illegal drug abuse); *In the Interest of J. L.*, supra at 229 (1) (same).

[7] (Citations and footnotes omitted.) *In the Interest of L. F.*, 275 Ga. App. 247, 250-251 (620 SE2d 476) (2005).